## Case No. 2,347.

### CAMP et al. v. The MARCELLUS.

[1 Cliff. 481.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1860. [2]

COLLISION BY PILOT'S FAULT—OBLIGATION TO EMPLOY PILOT—AUTHORITY OF PILOT — LIABILITY OF VESSEL.

1. Under the English statute, which declares owners not to be liable for loss or damage oc-

[3] [Reprinted by permission.]
[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]
[2] [Affirmed in Baxter v. Camp, 1 Black (66 U. S.) 414.]

casioned by the neglect or incompetency of any licensed pilot in charge of the vessel, it was formerly held, if there was neglect in the management of a vessel, and a pilot was on board, the neglect was, prima facie, attributable to him; but the rule is now settled, that, in order to bring their case within the statute, the burden is on the owners to show the pilot alone in fault.

[Cited in Creevy v. Eclipse Towboat Co., 14 Wall. (81 U. S.) 203.]

2. Vessels, whether going in or coming out of a harbor, are not, by the laws of Massachusetts, positively bound to employ a pilot.

[Cited in Judd Linseed, etc., Co. v. The Java, Case No. 7,559.]

3. While on board, in the absence of the master, the pilot has exclusive control of the navigation of the vessel; but if the master is present, his authority is not so far superseded by the pilot's power that he cannot interfere in case of gross ignorance or palpable and dangerous mistake.

[Cited in The Shubert v. The Brown, 45 Fed. 504.]

4. Parties who suffer by a collision are entitled to have their remedy against the vessel occationing the damage, and are not under the necessity of looking to the pilot for compensation.

[Appeal from the district court of the United States for the district of Massachusetts.]

Appeal in admiralty. The pleadings disclosed the following facts: On the 27th of September, 1859, about seven o'clock in the evening, a collision occurred at the Narrows, in Boston harbor, between the ship Marcellus, returning from a voyage to Singapore, and the schooner Empire, laden with sugar, and bound on a voyage to Bristol, in the state of Rhode Island. The schooner was struck on the larboard side, a little aft of midships, and shortly afterwards sunk. Recovery was claimed by the libellants, the owners of the cargo, for the loss of the sugar, and the expense of saving the same, over the net proceeds of its sale. The libel alleged that the schooner, just previous to the collision, was sailing on the western side of the channel, close hauled on the wind, with her starboard tacks aboard, the wind south-southwest; that she was steering southeast by south, and working up to the wind, in order to give the ship as much room as possible; that the ship was sailing up the channel, with the wind free, so that she might have passed the schooner on the larboard side without difficulty; as the ship approached towards the point of danger, the schooner hailed her to keep off, and was answered by the request to luff, which, as she was already close to the wind, was impossible; that the schooner did not change her course, but the ship, immediately after she hailed the schooner, luffed and instantly ran into the schooner, and presently both vessels drifted to the leeward shore. The answer alleged the collision to have taken place on the easterly side of the channel; that the wind was southwest; the ship sailing along the leeward edge of the channel, and hugging the shore as close as she could with safety; that while so sailing, the schooner was discovered coming down the harbor, with a free wind, appearing at first to be going to the windward of the ship, as she might have done, but afterwards changing her course as if going to leeward, she approached within a short distance of the ship, luffed across her bow, causing the collision, which sunk the schooner and damaged the ship, for which the respondents prayed to be allowed. A decree was entered in the district court [case unreported] in favor of the libellants, whereupon the respondents appealed. [Affirmed.] After the appeal, the respondents filed an amendment to the answer, alleging the ship to have been, at the time of the collision, under the control of a pilot, who was alone responsible for any fault in her navigation.

C. T. Russell and T. H. Russell, for libellants.

B. R. Curtis and H. Scudder, for claimants.

CLIFFORD, Circuit Justice. Much additional testimony has been taken since the trial in the district court, but it is not of a character to relieve the cause from the embarrassment which surrounded it in the court below, arising from the conflicting statements of the witnesses. Some of the circumstances, however, preceding the collision, are placed beyond the reach of doubt; and as they will aid in the solution of others more complicated by such conflicting statements, attention will first be given to such as substantially run clear of that difficulty.

According to the testimony of the master of the schooner, after she passed Nix's Mate, so called, "he luffed to, hauled the sheets flat aft and filled away." He states positively that he then looked at the compass, and that the schooner at that time headed southeast by south. All the witnesses who have any experience upon the subject, and whose opinions are worth considering, agree that what he says he did is precisely what he ought to have done in that situation. Assuming that his statement is reliable, then the schooner at that time and place was heading in a right direction to conform to the usages of the navigation, as appears by the concurrent testimony of every experienced witness in the case. Vessels going down the harbor, whether the wind is southwest or south-southwest, usually take the windward side of the channel in passing through the Narrows, and those coming up, as a general rule, are expected to take the leeward side under the same circumstances. As the schooner rounded the point, and before she was put upon the new course, she ran as near the land, according to the testimony of the mate, as the wind would allow her to do; and both the master and the mate testify that when she was put upon the course of southeast by south, she had the wind south-southwest, and was sailing as close to the wind as she would lay and fill her sails.

Considerable discrepancy exists in the testimony as to the course of the wind. Several witnesses examined by the respondents testify, some positively and others with more or less qualification, that the wind was southwest. Others admit that it was south-southwest a short time previous to the collision, but professed to think that it had changed before the collision occurred, which needs confirmation. Looking at the whole evidence, the better opinion is in favor of the theory assumed by the libellants.

None of the other facts embraced in this statement appear to be seriously controverted, except that one witness examined by the respondents says, if the wind and course of the vessel were such as stated by the master, and the schooner had been kept up to the wind during the passage down, she would have come in contact with the land on the windward shore. But that would depend so much upon the distance she was to the leeward when the course was taken, and upon the imperfectly ascertained fact how near she would lay to the wind, that the mere opinion of a single witness is not entitled to much weight. If she would not lay within less than six points, then it is believed that no such consequence would have followed, whether the wind was southwest or south-southwest; and even if she could be made to lay within five points, which is pretty close for an ordinary schooner, still it is scarcely probable that she was held constantly up to her utmost capability in that behalf.

Besides, it is insisted by the respondents that the true course of the schooner through the Narrows was southeast by south, which is the exact course on which she was put by the master. Men of intelligence do not ordinarily depart from a known regulation, calculated to promote their own safety, without some motive of interest or convenience. Beyond doubt the master was well acquainted with the navigation, having sailed through the Narrows, as the channel is called, sixteen times a year, on an average, for twenty-one years. Daylight was not entirely gone, when he set the course of the vessel, and he had good weather and only a fresh breeze as the vessel advanced under that course. Nothing short of wilful default, therefore, could have prevented him from putting the vessel on the usual course, as it was his duty to do. No one is able to assign any reason why he did not perform his duty, and in point of fact there is not the slightest ground to impeach either his veracity or the accuracy of his statement on this point.

It is not denied by the respondents that the schooner, when she was first seen by those on board the ship, appeared to be going to the windward of their vessel, but their theory is that she afterwards changed her course, as if going to the leeward of the ship, and when she had approached within a short distance luffed across her bows. Such is the theory expressly set up in the answer,

and in effect it is the theory attempted to be sustained by the proofs. Take, for example, the testimony of the pilot. He was asked how the schooner was going when he first saw her, and to that question he replied that she appeared to be going to the windward of the ship. That theory admits that the schooner when first discerned was sailing in the right direction, and clearly implies that her course was twice changed afterwards, before the collision took place. True it is that the pilot says, in another part of his testimony, that she did not come on to the regular course when she rounded the point, but that statement finds little support in the evidence, and is believed to be incorrect. According to his own account, the schooner was then a mile distant, and when directly asked how far she was from the ship when she fell off, he says perhaps it might have been a quarter of a mile, showing conclusively that he did not properly discriminate as to time and place in his former answer. Other witnesses examined by the respondents testify that they first saw the schooner one point on the lee bow of the ship, and that she came down the channel in a very irregular and varying course. Many of them also testify that, just before she approached the ship, she luffed across her bows, as alleged in the answer.

To support that theory the respondents assume that the course of the schooner was twice changed in going down the channel; that she first fell off close to the leeward shore, and then almost at the instant of collision luffed across the bows of the ship; and a large number of witnesses are examined by them, who testify to that effect. None of their witnesses, however, were on board the schooner, and those last referred to are speaking of events which they suppose to have occurred at the very moment the two vessels came in contact, when it clearly appears that there was much confusion on board the ship.

Witnesses were also examined by the libellants, and among the number are the mate of the schooner who was at the wheel, and the master who commanded her deck. They testify, without qualification, that the schooner throughout the passage down the Narrows was kept close to the wind, and affirm in the most positive terms that she was not suffered to fall off, and did not luff at all. Both the master and the mate knew what their own acts were, and unless their statements are correct they must have wilfully perverted the truth. Those examined by the respondents may be in error, and yet may not have stated what they do not believe to be true. Twilight was already waning before the vessels came in contact, and the witnesses for the respondents may have inferred that the schooner luffed, from the fact that her helmsman actually crowded her into the wind at the moment of the collision with a view to escape, if possible, the consequence

of the sudden and unexpected change made by the ship.

All experience shows, where there is, as in this case, a great disparity in the size, power, and speed of vessels approaching from opposite directions, that those in charge of the smaller of the two are very apt, as the danger of collision becomes imminent, to attempt through fright or otherwise to make some change in the course of the vessel, hoping, oftentimes vainly, either to shift the blow to some less dangerous part of the vessel, or to escape its consequences altogether. Prompted, as such efforts usually are, by good motives and the instincts of self-preservation, they are not in general regarded as faults, and certainly not when it appears that the act was superinduced by the primary fault of the other vessel. New York & L. U. S. Mail S. S. Co. v. Rumball, 21 How. [62 U. S.] 383.

Ten of the witnesses examined by the respondents, including a passenger, belonged to the ship, three were on board a steam-tug which had just gone up past both vessels, and four were on other vessels not very distant from the place of collision. Most of them represent more or less positively that the ship, just before and at the time of the disaster, was sailing within from thirty to fifty feet of the lee shore, or at all events about as near as she could sail with safety. They all agree, however, that vessels of the largest size can sail very close to that shore, and nothing can be more satisfactorily proved than is the fact that the force of the collision was such that the two vessels became so entangled together that it required some ten or fifteen minutes to separate them, and that during a considerable portion of that time both vessels were drifting to the leeward.

The reason why they so drifted is apparent from the undisputed facts of the case. Immediately after the collision, the crew of the ship hove back the main yard and mizzen top-sail; and in point of fact commenced, without delay, to take in or shorten all the sails. After the collision, the steam-tug, at the hail of the mate of the ship, returned for the purpose of towing the ship clear of the wreck. With that view she at first fastened a hawser to the schooner, and endeavored to pull her masts clear; but finding that the object could not be effected in that way, she got a hawser out astern of the ship, and towed the ship stern foremost clear of the schooner. During a considerable portion of this time the two vessels were drifting to the leeward, and it may be that the witnesses of the respondents mistook the place of collision for the place where the two vessels were when the ship was relieved, overlooking the fact that they had previously drifted towards the leeward shore. Assistance had been offered to the ship by the steam-tug before she entered the Narrows, but the offer had been refused by the ship, because she had a good leading breeze. Prior to the collision, the steamer had gone up past the ship on the windward side of the channel, and had also gone past the schooner on the leeward side.

Three of the crew of the ship were also examined by the libellants. Of these, one was the helmsman, and his testimony is of great importance in the case. He went to the wheel at six o'clock, and was in charge of it when the collision occurred. Just before it took place, the pilot, the master, a passenger, who was also a master mariner, and the mate, were all standing on the quarter-deck conversing. Presently the pilot stepped under the lee of the spanker, on the starboard side of the ship, and saw a vessel ahead under the lee of the ship. Instantly he called to the mate, and directed him to go forward and see how the vessel was standing. Pursuant to the order, the mate went forward, and perceiving that she was heading to the windward of the ship, he responded to the order, "all right, she's going to windward," but in a short time was heard to say, "Luff, hard down, hard down, luff," which were the first words heard by the man at the wheel. As soon as the wheelsman heard those words, the pilot, as he says, repeated the words, "Hard down, luff," and the witness testifies positively that he put the wheel down or nearly so. Before he could get it quite down, however, the pilot directed him to put it hard up, and jumped from the house and helped him execute the order, but the ship came in collision with the schooner before the change of the wheel from hard down to hard up had any effect upon the course of the ship. She was a large vessel of some fifteen hundred tons burden, and was sailing about eight miles an hour, while the schooner measured only about one hundred and twenty-nine tons, and was not sailing more than three or four knots an hour. When the wheelsman was asked how far he put the wheel down, under the first order, and whether it had the effect to change the course of the ship, he answered that he put it nearly down, and that it changed the course a point and a half, as near as he could judge by the light in the range ahead.

Since the commencement of the suit the pilot has had an interview with the witness, and endeavored to convince him that the ship did not luff when he put the wheel down. His response to the suggestions of the pilot is one of some significance in this connection. He told the pilot the ship must have luffed, and he knew she did by the mark he had on the land.

Another of the seamen belonging to the ship, and one of those examined by the libellants, strongly confirms the statements of this witness in several essential particulars. When the mate was sent forward, the witness was in the forecastle of the ship, and heard what the mate said. According to his account, the mate very soon sung out to the schooner to luff, and the master replied that

he could not; but the mate hallooed a second time, saying, "You must luff; heave her hard down." While this colloquy was going on between the mate of the ship and the master of the schooner, the witness says the ship luffed, and he accounts for it on the ground that the pilot made a mistake; that he understood the mate as speaking to those in charge of the ship, instead of those in charge of the schooner.

Without an exception, every one of those in charge of the schooner testify in the most positive terms that her course was not changed from the moment it was taken for the purpose of passing through the Narrows till the collision occurred; and the answer of the master to the hail of the mate of the ship goes very far to show that she was close on the wind at that time. Directions were given by him to the wheelsman, before he went forward, to hold her up close, and when he was hailed by the mate of the ship to luff, his answer was that he could not, and doubtless for the reason that she was already as close to the wind as she would lay. Numerous witnesses examined by the respondents affirm that the ship did not luff, but not one of them denies that this mistake was made by the wheelsman. Remarks made at the time, both by the master and the pilot, indicate very strongly that they were then of the opinion that the collision was justly ascribable to the indiscretion of the mate, and to the blunder which he occasioned. By the former it was said that the mate "bothered" the pilot, and by the latter that it would have been better if the mate had stayed aft where he was.

Without entering more into detail, I am of the opinion, upon the whole evidence, that the schooner did not change her course, as alleged in the answer, but that the collision was occasioned by the mistake on board the ship.

Since the appeal, the respondents have filed an amendment to their answer, which they ask to have allowed. They propose to add, in effect, that the ship, at the time of the collision was under the entire control and management of a legally authorized pilot, who by law had a right to the charge of the ship, and who alone is responsible for any damages arising from any fault in her navigation.

Suppose the amendment to be allowed, and to be a part of the answer, and the proposition to be assumed as stated in the proposed amendment, two replies may be given to the proposition, either of which is decisive against it.

No proper view of the evidence will justify the conclusion that the mistake which caused the collision was solely attributable to the pilot. On the contrary, even if it be admitted that the pilot repeated the words which led to the error, still it was not an order deliberately and understandingly given, but was clearly superinduced by the rashness and indiscretion of the mate. Whatever er-

ror, therefore, was committed, was not in fact caused by any negligence or unskillfulness on the part of the pilot, but by the officious and unauthorized interference of the first officer of the ship. It was so understood by the master, when he reproved the mate for having "bothered" the pilot, and by the pilot, who at the moment remarked that it would have been better if the mate had stayed aft, where he was before he was sent forward to see how the schooner was standing. But the pilot denies that he repeated the order, and the wheelsman is not supported in that particular by any other witness who had any knowledge upon the subject. That the mistake was caused by the mate there can be no doubt, but it was actually made by the wheelsman. When he heard the hail of the mate, he mistook it for an order directed to himself, and put the wheel down, so that it not only does not appear that the fault was attributable solely to the pilot, but the evidence clearly shows that the collision was occasioned through the fault of those belonging to the ship.

Owners are declared by statute in England not to be liable for any loss or damage by reason of any neglect, default, incompetency, or incapacity of any licensed pilot in charge of the vessel. Under that statute it was formerly held, that if there was neglect in the navigation of the vessel, and there was a pilot on board, the neglect was, prima facie, attributable to the pilot. But the rule is now well established that the burden is on the owners to show, in order to bring their case within the provisions of the statute, that the pilot was alone in fault. The Protector, 1 W. Rob. Adm. 45; The Diana, Id. 131; The Ripon, 6 Notes of Cas. 245; The Christiana, 7 Notes of Cas. 2; Stuart v. Isemonger, 4 Moore, P. C. 11; Hammond v. Rogers, 7 Moore, P. C. 160; The Batavier, 40 Eng. Law & Eq. 19; The Mobile, 20 Law Rep. 172.

Vessels are not positively bound in any case, by the law of this state, to employ a pilot, whether going in or coming out of a harbor; but when inward bound, and a pilot seasonably offers his services and is ready to enter upon the duty, the ship must pay pilotage fees, even if his services are refused. While on board, the pilot, in the absence of the master, has the exclusive control and direction of the navigation of the vessel; but if the master is present, the power of the pilot does not so far supersede the authority of the master, that the latter may not, in case of obvious and certain disability, or gross ignorance and palpable and imminently dangerous mistake, disobey his orders and interfere for the protection of the ship and the lives of those on board. Divided authority in a ship with reference to the same subject-matter is certainly not to be encouraged, and can never be justified or tolerated, except in cases of urgent and extreme necessity. While standing by and wit-

nessing a self-evident mistake manifestly and imminently endangering the ship, and certain to cause a collision, the master should not remain silent, but might well interpose, so far at least as to point out the error, and suggest the proper corrective. Had there been less conversation on the house or quarter-deck of the ship, among the master mariners there assembled, just before the schooner was discerned, and more attention given to the duties of a lookout it is believed there would have been much less occasion . for haste in sending the mate forward and greatly less confusion on board the vessel at the moment of danger. Ship-owners, it is true, are held not liable by statute in some jurisdictions, when the ship is under the charge of a pilot; but the circumstances of this case are such, that the application of the rule in this controversy even if it can be acknowledged at all under our jurisprudence, would be most unjust and inequitable..

Prior to the statute in England, Sir William Scott held, in the case of The Neptune, ·1 Dod. 467, that parties who suffer by a collision are entitled to have their remedy against the vessel occasioning the damage, and are not under the necessity of looking to the pilot, from whom redress is not always to be had, for compensation. It cannot be maintained, said that learned judge, that the circumstance of having a pilot on board, and acting in conformity to his direction, can operate as a discharge of the responsibility of the owner; and such is believed to be the true exposition of the maritime law, independently of any statutory regulation upon the subject. Ships sailing to and from certain ports in England are obliged by law to receive a pilot, and it is upon the ground that the relation of principal and agent does not exist in such cases between the owners and the pilot, that her courts have held that his presence and control discharges the owners from all responsibility, in case the accident happens entirely through his fault. But it is not correct to suppose that the master, in this state, even of an inward-bound ship, is compelled to accept the services of a pilot. Notwithstanding a pilot may seasonably offer his services, still the master may decline them and continue to navigate his vessel; but in that event he must pay the legal fees of the pilot. Martin v. Hilton, 9 Metc. [Mass.] 371; Hunt v. Carlisle, 1 Gray, 257.

Remarks of the court are to be found in the case of The Carolus [Case No. 2,424], which seem to indicate that the owners of an inward-bound vessel, having a pilot on board, are not liable in a case like the present; but those remarks were not necessary to the decision of the cause, and the weight of authority in this country is greatly the other way. Smith v. Creole [Id. 13,033]; Bussy v. Donaldson, 4 Dall. [4 U. S.] 206; Williamson v. Price, 4 Mart. (N. S.) 399; The Lotty [Case No. 8,524]; Yates v. Brown, 8 Pick. 23.

Chancellor Kent says the pilot is considered as master pro hac vice; and if any loss or injury be sustained in the navigation of the vessel while under his charge, he is answerable as strictly as if he were a common carrier for his default, negligence, or unskillfulness; and the owner also is responsible to the party injured by the act of the pilot, as being the act of his agent. 3 Kent, Comm. (9th Ed.) 243. See, also. Huggett v. Montgomery, 2 Bos. & P. (N. S.) 446; Attorney General v. Case, 3 Price, 302; Abb. Shipp. (5th Am. Ed.).p. 220.

Upon the whole case, I am of the opinion that the decision of the district court was correct, and the decree there made is accordingly affirmed, with costs.

. [NOTE. Claimants appealed from the final decree of the circuit court to the supreme court, which affirmed the holdings below on the ground that, the questions arising on the pleadings being of fact simply, and the circuit and district courts having concurred in deciding them, it could not interfere merely upon doubts founded on the number or credibility of the witnesses; that the presumptions were against appellant, and consequently the burden of proof was on him to prove affirmatively some mistake made below; and, further, that it was insufficient to show that, on the theory supported by some witnesses, a different decree might have been rendered, as the record contained sufficient evidence to sustain the decree appealed from, and the weight of the testimony sufficiently supported it. Baxter v. Camp, 1 Black (66 U. S.) 414.]