STATE of Alaska, BOARD OF MARINE PILOTS, State of Alaska, Department of Commerce and Economic Development, Division of Occupational Licensing, Appellants,

v.

David RENWICK, Appellee.

No. S–7379.

Supreme Court of Alaska.

Feb. 21, 1997.

Rehearing Denied April 4, 1997.

Gayle A. Horetski and Stephen C. Slotnick, Assistant Attorneys General, and Bruce M. Botelho, Attorney General, Juneau, for Appellants.

Richard D. Kibby and Dan E. Dennis, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

### OPINION

COMPTON, Chief Justice.

## I. INTRODUCTION

The Board of Marine Pilots (Board) appeals the superior court's reversal of the Board's order summarily suspending David Renwick's marine pilot's license. We reverse and direct the superior court to remand the case to the Board.

## II. FACTS AND PROCEEDINGS

These are the facts as found by the Board:[1]

At approximately 5:30 p.m. on March 21, 1994, Captain K. Yamaguchi, the master of the M/V REEFER BADGER, contacted Lynda Smith of ALAMAR [Alaska Maritime Agencies] by radio requesting the dispatch of a pilot because the REEFER BADGER was dragging anchor in Captain's Bay on Unalaska Island near Dutch Harbor, Alaska. As Captain's Bay is within compulsory pilotage waters, the Master needed a pilot to reposition the vessel.[2]

Ms. Smith contacted Captain Thomas Dundas, an Alaskan Marine Pilot, who was the dispatcher on duty for Alaska Marine Pilots and Dispatching Service (AMP).

1. "Respondent" has been changed to "Renwick." Paragraph numbers and record citations have been deleted.

2. AS 08.62.160 provides:

A vessel subject to this chapter navigating the inland or coastal water of or adjacent to the state as determined by the board in regulation shall employ a pilot holding a valid license under this chapter. The board shall define the mandatory pilotage water of the state.

Captain Dundas dispatched Captain David Renwick to the REEFER BADGER, and accompanied by another pilot, Captain David Sanders, drove Renwick to the OSI Dock Facility at Captain's Bay where Renwick boarded the pilot boat, the tug LOWELL S, under the command of Captain Amos Crauthers.

At all times relevant to the events in question, the weather in Captain's Bay was severe; the wind was blowing at 50–60 knots, with greater gusts, and seas were from five to six feet high. The wind was from the S/SW, blowing from the head (closed end) of the bay toward the open end of the bay.

There are three designated anchorages in Captain's Bay, numbered 1–3 from the head of the bay. Prior to Renwick's dispatch to the REEFER BADGER, the vessel had been in the designated anchorage No. 2. The M/V EIYO was in the No. 3 anchorage to the north of the REEFER BADGER, west of the OSI dock. The anchorages in Captain's Bay are at the head (south) end of the bay, as the remainder of the bay is generally too deep to provide safe anchorage. Captain's Bay, especially to the south and the west of the designated anchorages, contains numerous navigational hazards in the forms of island, reefs and shoals. Maneuvering room is limited.

When Renwick first boarded the REEFER BADGER, the vessel was located inshore of anchorage No. 2, southwest of the South Reef at OSI. The vessel was in danger due to the proximity of the shoreline. Renwick assumed the "conn" of the vessel, and was able to maneuver the REEFER BADGER out of immediate danger at that time.

Renwick inquired as to the situation in regard to the ship's anchor(s). He was unable to determine the situation from the Master, in part because of the Master's limited understanding of English. Consequently, he made an inquiry of Captain Crauthers of the LOWELL S. Captain Crauthers informed Renwick that there were two anchors out, and that these anchors were "wrapped" (fouled together).

From the Second Mate, who spoke English, Renwick confirmed that the vessel had two anchors out; seven shackles to starboard, and two shackles to port.

Renwick next maneuvered the REEFER BADGER out to its original anchorage, at designated anchorage No. 2, and proceeded to attempt to unfoul the anchors. Renwick gave a number of commands in an attempt to free the anchor chains by slacking one chain and heaving on the other. Renwick failed to effectively communicate his commands to the Master or to the mate who spoke English. The Master of the REEFER BADGER was communicating orders to untangle the anchors in Japanese to the Chief Mate, who was located on the vessel's forecastle. As corroborated by Captain Crauthers, who could hear the commands on the radio, and observe the crew's actions, the crew at times performed commands contrary to those given by Renwick.

In the course of attempts to untangle the anchors, after approximately 45 minutes to one hour under Captain Renwick's direction, the REEFER BADGER was blown broadside to the wind, with its bow to the east. The vessel at that time was about one quarter of a mile off shore.

The REEFER BADGER was set downwind toward the eastern shore of Captain's Bay, in the vicinity of OSI Basin. At this point, the REEFER BADGER's bow was about 230 feet from the eastern shore.

Renwick ordered "let go anchor chain," intending that the anchor and anchor chain be detached. Instead, the port anchor was dropped, still attached to the vessel. "Let go anchor chain" is the command that would be used when ordering the anchor dropped for the purpose of anchoring the vessel.

Renwick ordered half astern followed by full astern. At this time, the M/V EIYO called the REEFER BADGER and warned them that they were coming too close to the EIYO. The Master told the second officer to watch out the back, to check the EIYO's position. The M/V EIYO was located in the center of the bay, and was swinging or "weaving" back and

forth in the wind. Renwick was not watching the EIYO, and Captain Yamaguchi notified him of the danger. Renwick told Captain Sanders the next day that he was not sure if the REEFER BADGER had cleared the EIYO before he gave the engine astern order.

The REEFER BADGER reached a state of extremis due to its proximity to the shore and its movement astern toward the M/V EIYO. Captain Crauthers testified that if someone had not taken action, the REEFER BADGER would have grounded. The Master testified that he was worried that if he had followed Renwick's astern order, the REEFER BADGER would have collided with the EIYO.

To avoid a collision with the M/V EIYO, the Master countermanded Renwick's astern engine order, rang stop on the telegraph, then rang half ahead, and ordered starboard rudder. The REEFER BADGER then moved away from the EIYO, and turned away from the shore and toward the closed end of the bay.

Renwick testified that he informed the Master that he was leaving the ship. If this statement was made by Renwick, it was not effectively communicated to the Master, who testified that he "did not hear" anything about Renwick leaving.

Renwick called Captain Crauthers on VHF radio, stating, "this thing's about to go aground, I'm not going to be on it when it happens. Come get me." Captain Crauthers maneuvered the LOWELL S alongside the REEFER BADGER as Renwick made a "hurried exit," leaping from the pilot ladder and landing on his upper chest on the bow of the tug, where a crew member grabbed him to make sure he didn't fall overboard.

After his departure from the REEFER BADGER, at approximately 6:45 p.m., Renwick contacted Lynda Smith of ALAMAR on the VHF radio to inform her that there was a problem on the REEFER BADGER. Renwick informed Ms. Smith

that he was on the tug LOWELL S, that the crew was not listening to him, and that he felt that the ship was going to ground. Renwick also stated that he "couldn't risk going through a whole court mess again," a statement that was not understood by Ms. Smith at the time.[3]

After she spoke with Renwick (on the tug), Ms. Smith contacted the REEFER BADGER, and asked to speak to the Master. The second officer told her that the captain was "very busy" at that time. Shortly after, Ms. Smith was able to speak to the Master directly. She spoke to the Master in English, and asked him to please listen to the pilot; Captain Yamaguchi replied that the pilot was on the pilot boat. Believing that any misunderstanding might be cleared up easier if someone spoke to the Master in Japanese, Ms. Smith called the vessel owners, Ikitsu Shipping Company in Tokyo, and asked them to call the REEFER BADGER to find out what was going on. Ms. Smith's intent was to get a pilot back on the ship so that the REEFER BADGER would be moving in compliance with the law.

The Master succeeded in averting a collision with the EIYO and a grounding on the shore of Captain's Bay, under adverse conditions and in severe weather, while Renwick was not on board. At Ms. Smith's request, Renwick reboarded the REEFER BADGER, after it had moved out of danger.

At 7:00 p.m., Renwick contacted AMP President Captain Tom Dundas, who was acting as dispatcher for the pilot association, from the REEFER BADGER by VHF radio. During the radio conversation between Captain Dundas and Renwick, Renwick stated that he was not going to be aboard the vessel if it grounded because "he couldn't afford it with his license problem." Captain Dundas asked Renwick if he would guarantee that he would stay with the vessel if it again moved into dan-

---

3. Pursuant to the terms of an agreement which settled a prior licensing action against Renwick, if Renwick became subject to sanction again the Board could take into account "the fact that Captain Renwick was the pilot when the President Madison grounded in Dutch Harbor in 1984, when the Kyokushin Maru grounded in Sand Point in February 1991, and when the Kyokushin Maru grounded in Popof Strait in March 1991."

ger. Renwick replied that he would not guarantee that he would stay with the vessel. Captain Dundas decided to send another pilot to the REEFER BADGER to relieve Renwick, and dispatched himself to the vessel.

Upon his arrival at the REEFER BADGER, aboard the tug LOWELL S, Captain Dundas decided that the best course of action was for him to stay aboard the tug, to direct the efforts to unfoul the anchors. Renwick agreed to remain aboard the REEFER BADGER on the condition that, should the vessel again move into danger, Captain Dundas would immediately board the ship so that Renwick could depart. Renwick testified that he intended to leave the ship if it moved into danger again, whether Captain Dundas relieved him or not.

By working together, Captain Dundas and Renwick eventually were able to untangle the fouled anchors, and the REEFER BADGER proceed to sea, escorted by the tug LOWELL S with Captain Dundas aboard.

In May 1994 the Division of Occupational Licensing (Division) petitioned the Board for an immediate suspension of Renwick's marine pilot license. The Board granted the petition, finding that Renwick's continued licensure "posed a clear and immediate danger to the public health and safety." *See* AS 08.01.075(c).[4] Renwick appealed the suspension and requested a hearing. Testimony was taken and evidence introduced at several hearings. In December 1994 the Board issued a decision in which it found the facts

referenced above. The Board upheld the suspension, finding that Renwick violated applicable statutes and regulations by abandoning the REEFER BADGER in mandatory pilotage waters when it was *in extremis.*

Renwick appealed the Board's suspension order to the superior court.[5] The superior court held that Renwick had no duty to remain on board the REEFER BADGER after the master of the vessel countermanded Renwick's orders. The court reversed the Board's order and directed the Board to vacate its finding that Renwick failed in his duty aboard the Reefer Badger.[6]

The Board appeals.

### III.  DISCUSSION

This court gives no deference to the decision of the superior court when it acts as an intermediate court of appeal. *Usibelli Coal Mine, Inc. v. State, Dep't of Natural Resources,* 921 P.2d 1134, 1141 (Alaska 1996). We review the Board's decision using the reasonable basis standard and defer to the Board's interpretation of its own regulations. *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982) ("[W]here an agency interprets its own regulation ... a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue.").

The Alaska Marine Pilotage Act (Act) requires vessels traveling through Alaska's inland or coastal waters to employ state-licensed marine pilots for safe navigation. AS 08.62.160. A pilot so employed "has a primary duty to safely navigate vessels under

---

**4.**  AS 08.01.075(c) provides in part:

> A board may summarily suspend a licensee from the practice of the profession before a final hearing is held or during an appeal if the board finds that the licensee poses a clear and immediate danger to the public health and safety.

**5.**  The superior court and the parties treated the proceeding as an administrative appeal from a final judgment of the Board. Because the Board addressed only the issue of the propriety of the summary interim suspension, and a proceeding to revoke Renwick's pilot's license was still pending before the Board, Renwick's appropriate remedy was to petition the superior court for

discretionary review under Appellate Rule 401. *See* Appellate Rule 601(c). However, since the judgment of the superior court directed the Board to dismiss the proceeding pending against Renwick, the Board was required only to perform a ministerial act to dispose of the case. Hence, the judgment of the superior court can be deemed a "final judgment" for the purposes of appeal to this court. *Municipality of Anchorage v. Coffey,* 893 P.2d 722, 725 n. 6 (Alaska 1995) (remand ordering agency to perform purely ministerial act qualified as final judgment for purposes of supreme court review).

**6.**  On motion of the State, this court stayed the judgment of the superior court pending resolution of this appeal.

the pilot's direction and control and to protect life and property and the marine environment while engaged in the provision of pilot services." AS 08.62.157(a). The Act gives the Board broad authority to adopt regulations providing for "proper and safe pilotage...." AS 08.62.040(b). Among other regulations, the Board has promulgated 12 AAC 56.960(a), which provides that pilots "shall be on duty piloting the vessel at all times when the vessel is in transit in compulsory pilotage waters." Another regulation, 12 AAC 56.990(14), defines "on duty" to mean "being on the navigating bridge of the vessel and having control of the vessel, or being on the navigating bridge of the vessel and assisting the master or navigational officer." In the present case, the Board concluded that Renwick's "decision to abandon the REEFER BADGER while it was *in extremis* was in violation of AS 08.62.157, and 12 AAC 56.960(a) as defined by 12 AAC 56.990(14)...."

In reversing the Board, the superior court stated that the legislative history of AS 08.62.157(a) "does not suggest the legislature intended to change the duties of pilots at common law." From this premise, and from the unsupported assumption that at common law pilots had no duty to remain on board a vessel after the master had reasserted command, the superior court concluded that 12 AAC 56.990(14) was "at variance" with AS 08.62.157(a):

> The Board [ ] has construed [12 AAC 56.990(14) ] to impose a duty upon a marine pilot to remain on board even when, as here, the master has rightfully or wrongfully reasserted his command authority over the vessel. By the same reasoning, one might argue that this definition allows the pilot to meet his obligation to the vessel, its owners and the State of Alaska, by simply standing by and assisting. It is erroneous to do so. That portion of 12 AAC 56.990(14) which reads "being on the navigating bridge of the vessel and assisting the master or navigational officer" is at variance with [AS 08.62.157(a) ] and 12 AAC 56.960 if so interpreted.

Consistent with the superior court's reasoning, Renwick argues that the Board's definition of "on duty" in 12 AAC 56.990(14) contravenes AS 08.62.157(a).

■ Administrative agencies are given wide latitude when they are interpreting statutes they have been charged to administer. *Whaley v. State*, 438 P.2d 718, 722 (Alaska 1968) ("[T]he well settled rule [ ] requires courts to give consideration and respect to the contemporaneous construction of a statute by those charged with its administration, and not to overrule such construction except for weighty reasons."); *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971) ("[W]hen a regulation has been adopted under a delegation of authority from the legislature to the administrative agency to formulate policies and to act in the place of the legislature, we should not examine the content of the regulation to judge its wisdom, but should exercise a scope of review not unlike that exercised with respect to a statute.").

■ Regulations are presumptively valid, *State, Dep't of Revenue v. Cosio*, 858 P.2d 621, 624 (Alaska 1993), and will be upheld as long as they are "consistent with and reasonably necessary to implement the statutes authorizing [their] adoption." *Chevron U.S.A. Inc. v. LeResche*, 663 P.2d 923, 927 (Alaska 1983). We explained in *Cosio*, however, that reasonable necessity is not a requirement separate from consistency. If it were, courts would be required to judge whether a particular administrative regulation is desirable as a matter of policy. We stated in *Cosio:*

> If we find the proper nexus between the challenged regulation and the statutory purpose (i.e., the regulation is consistent with the statutory purpose), we do not generally require a separate showing of reasonable necessity. Strictly applied, inquiry into whether a regulation is necessary as a means to a legislative end would mire this court in questions of public policy and the advisability of possible alternatives. Such a searching inquiry is beyond our authority and expertise. It is a rare case where a regulation, although not inconsistent with the purpose of the statute,

is wholly superfluous to the achievement of that purpose. *Cosio,* 858 P.2d at 624 n. 1. Thus the review we conduct in this case is a review for consistency with the authorizing statute.

■ 12 AAC 56.960(a) and 12 AAC 56.990(14), when read together, require a pilot to remain on board a vessel and assist in its navigation even if the master of the vessel countermands the pilot's orders. These requirements are consistent with the purpose of the Act. The Act is designed to insure "safe and proper pilotage" upon Alaska's inland and coastal waters. AS 08.62.040(b). Marine pilots are employed because of their "particular knowledge of local conditions." *Barbey Packing Co. v. The S.S. Stavros,* 169 F.Supp. 897, 903 (D.Or.1959). Because of their familiarity with local conditions, marine pilots are "indispensable" to a vessel's safe passage. *Bach v. Trident Steamship Co., Inc.,* 947 F.2d 1290, 1293 (5th Cir.1991) (Brown, J., dissenting). If pilots were at liberty to jump ship at their choosing, the Board could reasonably conclude that vessels would be left to navigate Alaska's inland waters at their peril, without the valuable knowledge of local conditions pilots offer. The Board's rule arguably furthers the Act's goal of providing safe and proper pilotage by requiring compulsory pilots to remain on the navigating bridge of vessels at all times.

■ Renwick argues that the Board's rule creates an unacceptable division of authority aboard ship and contravenes the common law rule that a compulsory pilot's orders must be obeyed. It is true that in the ordinary course a compulsory pilot "is in supreme command of the vessel while he is navigating it." *Evans v. United Arab Shipping Co. S.A.G.,* 4 F.3d 207, 218 (3d Cir.1993). However, at common law, the master of the vessel retained the authority to countermand a pilot's orders in limited circumstances. *Delta Transload, Inc. v. The Navios Commander,* 818 F.2d 445, 451 n. 17 (5th Cir.1987) ("[T]he master retains authority to countermand the pilot's orders which would place the vessel in a position of apparent and avoidable danger."); *Avondale Indus. v. Int'l Marine Carriers,* 15 F.3d 489, 493 (5th Cir.1994) (the

master of the vessel "has a responsibility to monitor the pilot's decision making."); *Hercules Carriers, Inc. v. State,* 768 F.2d 1558, 1576 (11th Cir.1985) ("[A] pilot's presence on board a vessel does not relieve the master or watch officer of their duties and obligations."); *Barbey,* 169 F.Supp. at 902 ("[S]hould it be apparent to the master that his vessel is entering a zone of danger and ... the pilot fail[s] to ... respond to the situation in a manner which will insure the safety of the vessel, then the master should and must relieve the pilot."); *Camp v. The Marcellus,* 4 F. Cas. 1141, 1145 (D.Mass. 1860) ("[T]he power of the pilot does not so far supersede the authority of the master, that the latter may not, in case of obvious and certain disability, or gross ignorance and palpable and imminently dangerous mistake, disobey his orders and interfere for the protection of the ship and the lives of those on board.").

■ While the Board's decision that Renwick was not relieved of responsibility to remain "on duty" by the master's countermand is consistent with the common law, the Board's decision need not mirror the common law to be valid. The relevant inquiry is whether 12 AAC 56.990(14), which the Board applied to reach its decision, is consistent with the Act. The Board could reasonably decide that life, property, and the marine environment are better served by a rule requiring pilots to remain on duty even if their orders are countermanded. While "[d]ivided authority in a ship with reference to the same subject-matter is certainly not to be encouraged," *The Marcellus,* 4 F. Cas. at 1145, the fact that a pilot's orders are countermanded does not mean that the pilot is at liberty to leave the ship. 12 AAC 56.990(14), which recognizes this rule, is consistent with the Act's goal of promoting safe pilotage.

## IV. CONCLUSION

We REVERSE the judgment of the superior court, and direct that it REMAND the case to the Board for such further proceedings as may come before it.