INTERIOR ALASKA AIRBOAT
ASSOCIATION, INC.,
Appellant,

v.

STATE of Alaska, BOARD
OF GAME, Appellee.

No. S–8869.

Supreme Court of Alaska.

March 2, 2001.

Appearances: Lynn E. Levengood, Downes, MacDonald & Levengood, P.C., Fairbanks, for Appellant.

Appearances: Kevin M. Saxby, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Chief Justice.

## I. *INTRODUCTION*

Challenged in this case is the designation of two areas by the Board of Game as controlled use areas (CUAs). The Noatak CUA closes a corridor along the Noatak River to the use of aircraft for big game hunting for a part of the hunting season. The Nenana CUA prohibits the use of airboats for moose hunting in a portion of the Tanana Flats for all of the hunting season. Interior Alaska Airboat Association contends that the regulations establishing these CUAs violate article I, section 1 and article VIII, sections 1–4, 14, 16 and 17 of the Alaska Constitution. The Association also contends that the regulations exceed the Board's authority and that they are unreasonable and arbitrary. The superior court granted summary judgment in favor of the Board. We conclude that the regulations are constitutional, within the authority of the Board, and neither arbitrary nor unreasonable. We therefore affirm.

The Noatak CUA currently encompasses a corridor ten miles wide centered on the Noatak River, extending upstream from the river mouth for some 220 miles. This CUA is closed to the use of aircraft for big game hunting or the transportation of hunters between August 25 and September 15 of each year.[1] The justification for the Noatak CUA is two-fold. First, the restrictions on hunter access by airplane are maintained in order to help reduce harvests on a declining moose population. Second, the prohibition on aircraft use is maintained to resolve conflicts between hunters who use aircraft for access and hunters who use boats. Most hunters who use aircraft do not reside on the Noatak and most local hunters use boats. The Board of Game found that "[c]onflict occurs when low-altitude flights by aircraft-borne hunters disturb wildlife and disrupt hunting activities of those using boats. Conflict also occurs when hunters transported by aircraft occupy the best camping and hunting locations along the river, thereby preventing lo-

1. In Unit 23, which encompasses the Noatak CUA, the caribou season is July 1–June 30 (but cows may not be taken May 16–June 30). *See* 5 AAC 85.025. In the Noatak drainage portion of Unit 23, the moose season is August 1–September 15, and October 1 March 31. *See* 5 AAC 85.045.

cal residents from using traditional hunting sites."

The Nenana CUA prohibits the use of airboats for moose hunting or transporting moose hunters in a large area of the Tanana Flats from September 1 through September 25, the entire moose-hunting season for the area. The purpose of the Nenana CUA is to forestall habitat alteration and eliminate conflicts between moose hunters who use airboats and moose hunters who use other means of transportation. Most hunters who reside in or adjacent to this CUA do not use airboats. The Board found:

> The purpose of the [Nenana CUA] is to mitigate chronic conflicts between groups of hunters and to minimize possible habitat impacts. The restriction of airboats is intended to limit noise disturbance to moose hunters including subsistence hunters who use still hunting and moose calling methods of hunting while still allowing reasonable access to the area for moose hunting by all. An area of comparable habitat, size and accessibility remains available to airboat hunters in adjacent areas.... This adjacent area has traditionally been less important for subsistence hunters and more frequently used by airboat hunters than has the [Nenana CUA].

The Association sued to set aside these CUAs. After both parties moved for summary judgment, the trial court granted the Board's motion and denied that of the Association. The court entered findings of fact based on undisputed facts and conclusions of law that the CUAs were lawfully established. We set forth at this point those of the court's findings of fact and conclusions of law which are particularly relevant to this appeal.

**Nenana Controlled Use Area**

1. The Board of Game heard testimony from members of the public in an area of the Tanana Flats near Nenana, Alaska, [of] airboat use by moose hunters interfering with traditional spot and stalk and still-hunting techniques used by subsistence moose hunters.

2. The Board of Game also heard testimony that in the same area, where heavy airboat use had occurred, some wildlife habitat changes, including alterations of drainage patterns, had been observed.

3. The Board of Game also heard testimony that airboat noise can range up to 135 decibels, approximately the same as the noise produced by the engine of a commercial jet aircraft being operat[ed] under full power, and that it was impossible for hunters to hear or call moose in the vicinity of such noise.

4. The Board of Game also heard from airboat users and manufacturers, who testified that technological advances were addressing the noise problem, and who countered the habitat damage testimony and various other complaints raised by others about airboat use.

5. The Board of Game concluded that a conflict existed between moose hunters using airboats and moose hunters using the more traditional spot and stalk and still-hunting methods, and that this conflict detrimentally affected the subsistence use of moose from the area, although game levels remain stable.

. . . .

**The Noatak Controlled Use Area**

1. The Board of Game heard testimony from the public that traditional caribou subsistence hunting methods, involving waiting at known caribou crossings along the Noatak River and shooting animals as herds approach the river bank, were being interfered with by hunters using aircraft to access the river corridor. The testimony was that the numerous take-offs, landings, and low overflights frequently made caribou nervous and drove them away from crossings where subsistence hunters were lying in wait.

2. The Board of Game heard from the Department of Fish and Game that subsistence harvests of caribou had declined in the area, even though the Western Arctic Caribou Herd had increased in size. The Department also recommended that moose harvest[s] along the Noatak River be carefully monitored, as moose harvests by hunters using aircraft for access were increasing.

3. The Board of Game also heard testimony that the Noatak River valley had

become an increasingly popular hunting destination, and that as many as 200 flights had occurred during the critical autumn subsistence caribou hunting period in a recent, relatively low-use, year.

4. The Board of Game also heard testimony from fly-in hunters and aircraft operators, arguing that their access should not be restricted or eliminated for various reasons including arguments that there was no shortage of game in the area and complaints about fairness, because the numbers of users who fly in is greater than the number of users who do not, and complaints about lack of access.

5. The Board concluded that a conflict existed between fly-in hunters, who were mostly seeking moose, and subsistence hunters who generally use boats to access the area and typically are seeking caribou at traditional subsistence hunting sites, detrimentally affecting the subsistence uses of caribou from the area.

. . . . .

**Conclusions of Law**

1. Regulations which limit a means of access used for hunting purposes fall within the statutory authority of the Board of Game to regulate means and methods used in the pursuit, capture, taking and transport of game and to regulate sport hunting and subsistence hunting as needed for the conservation, development and utilization of game. AS 16.05.255(a)(3) and (10).

2. The Alaska Supreme Court has examined such means and methods restrictions and found them to be time-honored management tools accepted as legitimate by the framers of the Alaska Constitution. *See Fish Spotters Ass'n v. State*, 838 P.2d 798 (Alaska 1992).

3. The regulations in question apply equally to all hunters and don't discriminate against any one group of Alaskans

nor classify users into separate use categories.

4. Because the regulations at issue merely restrict the use of certain types of mechanized vehicles for hunting, equal access and protection concerns are not implicated.

5. The Board of Game has both the right and the obligation to resolve disputes among competing users of Alaska's wildlife resources, and this is especially so when it finds that subsistence uses have suffered by virtue of competing use.

6. The Board of Game's conduct with regard to the Nenana Controlled Use Area and the Noatak Controlled Use Area was within both its statutory and its constitutional mandate, and was the result of careful examination and study.

In accordance with these conclusions the court entered final judgment dismissing the Association's complaint.

## II. *STANDARD OF REVIEW*

We review grants of summary judgment de novo.[2] Constitutional challenges are reviewed using a substitution of judgment standard.[3] Where the superior court acted as an intermediate court of appeal, we review the administrative decision directly.[4] Regulations are presumptively valid and will be upheld as long as they are "consistent with and reasonably necessary to implement the statutes authorizing their adoption."[5] But reasonable necessity is not a requirement separate from consistency. If it were, courts would be required to judge whether a particular administrative regulation is desirable as a matter of policy.[6] Thus where a regulation is adopted in accordance with the Administrative Procedures Act, and the legislature intended to give the agency discretion, we review the regulation first by ascertaining whether the regulation is consis-

**2.** *See Christensen v. NCH Corp.*, 956 P.2d 468, 474 (Alaska 1998).

**3.** *See Native Village of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

**4.** *See Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd.*, 991 P.2d 202, 206 (Alaska 1999).

**5.** *State, Bd. of Marine Pilots v. Renwick*, 936 P.2d 526, 531 (Alaska 1997).

**6.** *See id.; State, Dep't of Revenue v. Cosio*, 858 P.2d 621, 624 n. 1 (Alaska 1993).

tent with the statutory provisions which authorize it and second by determining whether the regulation is reasonable and not arbitrary.[7]

■■■ In determining whether a regulation is reasonable and not arbitrary courts are not to substitute their judgment for the judgment of the agency.[8] Therefore review consists primarily of ensuring that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making.[9]

## III. NON–CONSTITUTIONAL CHALLENGES TO THE CUAS

The Association makes a number of challenges to the CUAs which are not based on provisions of the Alaska Constitution. The Association argues that the regulations which establish the CUAs are beyond the statutory authority of the Board; that a regulation authorizing the Board to take action to avoid or minimize conflicts between users of off-road vehicles and other user groups where there is a "decline in the quality of the outdoor experience" is not authorized by statute; that the Board is barred by regulation from banning airboat use for hunting on navigable waters; and that the regulations creating the CUAs are arbitrary, unreasonable, and unnecessary. We turn to a discussion of these points.

### A. The CUAs Are Within the Statutory Authority of the Board of Game.

■■■ Alaska Statute 16.05.255 deals with the regulatory authority of the Board of Game. It provides, among other things, that the Board may adopt regulations it considers advisable for "establishing the means and methods employed in the pursuit, capture, taking, and transport of game,"[10] and for

"regulating sport hunting and subsistence hunting as needed for the conservation, development, and utilization of game."[11] The Association argues that the regulations are not authorized because of the absence of evidence that they are consistent with conservation and development goals or that they are needed for the conservation, development and utilization of game. For the reasons that follow we conclude that the regulations are within the statutory authority of the Board.

The legislature has authorized the Board to establish such means and methods that "it considers advisable."[12] The only textual limitation on this grant of authority is procedural. Means and methods regulations, like other Board regulations, must be adopted in accordance with the Administrative Procedures Act. There is no contention that there were procedural infirmities with respect to the CUAs in question.

In one sense, since the Board has explicit statutory authority to regulate means and methods, any means and methods which the Board considers advisable are consistent with the statute. But the Board of Game was created "for purposes of the conservation and development of the game resources of the state."[13] We agree with the Association that means and methods regulations should be reviewed for consistency with these overarching purposes.

In *Alaska Fish Spotters Association, Inc. v. State, Department of Fish & Game,* we discussed the definition of "conservation and development" in the context of a means and methods fisheries regulation. We stated:

In conformity with article VIII, section 2 of the Alaska Constitution, the legislature created the Board of Fisheries "[f]or purposes of the conservation and development

---

**7.** See *Kelly v. Zamarello,* 486 P.2d 906, 911 (Alaska 1971); see also *Renwick,* 936 P.2d at 531; *Cosio,* 858 P.2d at 624 n. 1.

**8.** See *Meier v. State, Bd. of Fisheries,* 739 P.2d 172, 174 (Alaska 1987).

**9.** See *Tongass Sport Fishing Ass'n v. State,* 866 P.2d 1314, 1319 (Alaska 1994); *Gilbert v. State, Dep't of Fish and Game,* 803 P.2d 391, 398 (Alaska 1990).

**10.** AS 16.05.255(a)(3).

**11.** AS 16.05.255(a)(10).

**12.** AS 16.05.255(a).

**13.** AS 16.05.221(b).

of the fishery resources of the state." AS 16.05.221(a). "We have previously defined 'conserving' as 'impl[ying]' controlled utilization of a resource to prevent its exploitation, destruction or neglect. 'Developing' connotes management of a resource to make it available for use.'" *Gilbert*, 803 P.2d at 393 n.1 (alteration in original) (quoting *Kenai Peninsula Fisherman's Coop. v. State*, 628 P.2d 897, 903 (Alaska 1981)).

In support of these goals, the legislature has authorized the Board to adopt regulations it considers advisable for "establishing the means and methods employed in the pursuit, capture and transport of fish" and for "regulating commercial, sport, subsistence, and personal use fishing as needed for the conservation, development, and utilization of fisheries." AS 16.05.251(a)(4), (12).[14]

The CUAs fit within the definitions of conservation and development as expressed in *Fish Spotters*. The Noatak CUA is maintained in part because of moose shortages. One reason for the Nenana CUA is to prevent habitat alteration caused by airboats. These are classic conservation reasons. Both of the CUAs also fall within the "development" definition employed in *Fish Spotters* for they are regulations which make game resources available for use in a certain way. The CUAs are therefore consistent with the conservation and development goals which guide the Board's conduct.

The Association argues that the CUAs in this case are not "reasonably necessary for conservation or development" even if they are consistent with these purposes. But in *State, Department of Revenue, Permanent Fund Dividend Division v. Cosio* we observed that when we review the validity of a regulation "we do not generally require a separate showing of reasonable *necessity*" where we find that the regulation is consistent with the statutory purpose.[15] We exer-

cise this restraint out of recognition that "inquiry into whether a regulation is *necessary* as a means to a legislative end would mire this court in questions of public policy and the advisability of possible alternatives."[16] "Such a searching inquiry is beyond our authority and expertise" and "[i]t is a rare case where a regulation, although not inconsistent with the purpose of the statute, is wholly superfluous to the achievement of that purpose."[17] More recently we have held that "reasonable necessity is not a requirement separate from consistency" and that our review should center on the question of consistency with the authorizing statute.[18]

Based on these authorities we confine our review to consistency with the authorizing statute, along with reasonableness and the lack of arbitrariness.[19] Any review of "necessity" would require the court to second guess policy choices that have been delegated to the Board by the legislature.

B. *The Regulation Authorizing the Board to Minimize Conflicts Between Users of Off–Road Vehicles and Others Is Authorized.*

■ 5 Alaska Administrative Code (AAC) 92.004 provides in part:

(a) Off-road vehicles are a legitimate method of transporting hunters and game in the state, subject to requirements of federal, state, and local landowners. If the Board of Game, through its public process, finds that off-road vehicle use attributed to hunting activities in a specific area has resulted or is likely to result in one or more of the following conditions, it will, in its discretion, take action to avoid or minimize the conditions:

. . . .

(4) chronic conflicts with other user groups leading to a decline in the quality of the outdoor experience.

This regulation does not apply to the Noatak CUA as airplanes are not defined in the

---

14. 838 P.2d 798, 800 (Alaska 1992).

15. 858 P.2d 621, 624 n. 1 (Alaska 1993).

16. *Id.*

17. *Id.*

18. *Board of Trade, Inc. v. State, Dep't of Labor*, 968 P.2d 86, 89 (Alaska 1998); *see also Renwick*, 936 P.2d at 531.

19. *See supra* note 7.

regulation as off-road vehicles. But the regulation does apply with respect to the Nenana CUA and the Board referred to it in its findings establishing the Nenana CUA. The Association challenges this regulation, contending that "decline in the quality of the outdoor experience" is not a subject that is fairly subsumed within the "conservation and development" authority of the Board of Game.

"Development" includes making a resource available for use. Making a game resource available for use, in turn, entails making judgments as to how the resource will be used. Users' preferences, including those based on the quality of their experience, are relevant in deciding how a resource will be used. Game, like other natural resources, is managed for the benefit of people [20] and one measure of benefit to people is the quality of their experiences. Based on these considerations we think that there can be no reasonable question but that the Board may consider the quality of hunters' outdoor experiences under its development mandate.

In rejecting the Association's argument on this point we note that there are numerous CUAs statewide that have been established at least in part for quality-of-experience reasons. The State lists nine CUAs located in the Tanana River drainage alone that ban some types of motorized access for hunting. Some, such as those in the Wood River and Yanert CUAs, ban motorized access including motor boats and airboats but not aircraft. Others, as in the Delta, Glacier Mountain, and Macom Plateau CUAs, ban all motorized access including aircraft. Statewide, there are twenty-two CUAs, all of them imposing some limitations on the use of motorized transport for hunting.

### C. The Board Is Not Barred from Regulating Airboats on Navigable Waters.

■ The Association also argues that the Board is only permitted to regulate airboats

when they are operated outside of navigable waters, because 5 AAC 92.004 defines off-road vehicles as "airboats operated outside a navigable waterway." However, 5 AAC 92.004 does not limit the Board's authority; it is merely a regulation, separate from the CUA regulations, that is also within the Board's authority to enact. The Board has the authority under AS 16.05.255 to regulate vehicles used for hunting purposes or transportation of hunters, hunting gear, or game, and this authority extends to navigable waters.

### D. The Regulations Are Reasonable and Not Arbitrary.

■ The Association preliminarily challenges the regulations on the ground that the Board has not provided "a decisional document sufficient to justify the challenged CUA's." This court has required that agency adjudicative decisions be accompanied by written findings and a decisional document.[21] As to non-adjudicative decisions, such as those presently before us, we have "strongly suggested," but not mandated, that these also should be supported by adequate decisional documents.[22] The point is moot in this case because there are adequate decisional documents with respect to both CUAs.

The Association's arguments that the CUAs are unreasonable and arbitrary include complaints that the CUAs are too large given the limited number of local hunters; that in the case of Nenana, even-handed noise emission regulations would be better than banning all airboats because some other transportation devices permitted in the CUA are noisier than airboats and because airboats could be made more quiet; and that "it is unreasonable for the Board not to consider that the appellant's access into the public lands within the Nenana CUA was not of high individual importance, equal to that of the complaining group."

---

**20.** *See* Article VIII, section 2 of the Alaska Constitution: "The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people."

**21.** *See Peninsula Marketing Ass'n v. State,* 817 P.2d 917, 922 (Alaska 1991).

**22.** *See id.* at 922–23.

In our view these complaints express legitimate points of view of the sort that the Board can and should consider in deciding whether to create or in some way alter a CUA. They are matters of policy committed to the judgment of the Board. The CUAs might be smaller, or perhaps they should not exist at all. Explicit noise regulations might be substituted for prohibitions on types of vehicles. Other methods of hunting transportation might be permitted or banned. Exceptions in some areas might be made. All such questions involve policy for the Board.

 In deciding whether a regulation is reasonable and not arbitrary we deal not with policy but process. We ask whether the agency has failed to consider an important factor or whether it has "not really taken a 'hard look' at the salient problems and has not genuinely engaged in reasoned decision making".[23] We find no process failures in this case.

Numerous public hearings have been held with respect to the establishment of and maintenance of the CUAs. Much public testimony has been received. The Board's findings concerning the need for establishment and maintenance of the CUAs reflect careful consideration of this testimony. The Board's findings also reflect concern for those favoring means of transportation excluded from the CUAs.[24] The findings concerning the need for the CUAs are supported by testimony, though there is also conflicting testimony.

No important factor has been identified which the Board failed to consider.

When the Association argues that the Board failed to consider important factors in its decision to create the CUA, it is really arguing that the Board should have weighed the factors differently. For example, the Association claims that the Board failed to "consider that the Appellant's access into the public lands within the Nenana CUA was not of high individual importance, equal to that of the complaining group." The regulation at issue, however, does not limit anyone's access to the public lands, merely the means of access for hunting and related purposes. The Association also claims that the Board ignored testimony that other motorized vehicles were as loud as airboats. However, the Board also heard testimony that airboats were uniquely loud, and their failure to give more weight to testimony advocated by the Association does not constitute a failure to take the "hard look" required by Alaska law.[25] The Association argues that "[t]here is no record that the BOG considered the importance of the outdoor experience of persons utilizing aircraft access to [the Noatak] CUA." To the contrary, the record demonstrates that the Board did give consideration to how the challenged regulation would affect aircraft users. The Association's real dispute is with the relative weight the Board accorded to the importance of the outdoor experience of aircraft users. This court is not empowered to resolve that dispute.

**23.** *Southeast Alaska Conservation Council, Inc. v. State,* 665 P.2d 544, 549 (Alaska 1983) (quoting Leventhal, *Environmental Decision Making and the Role of the Courts,* 122 U. Pa. L.Rev. 509, 511 (1974)).

**24.** The Board gave careful consideration to aircraft use for hunting in the Noatak area and airboat use for hunting in the Nenana area. In both cases the Board decided that opportunities to use these means of transportation still existed near or in the affected areas. In the case of Noatak the Board noted that aircraft-borne moose and caribou hunters still had access to rivers in the Noatak drainage outside the CUA and access was available during the long moose and caribou seasons before August 25 and after September 15. The Board also noted that hunters can be transported to tributaries by aircraft outside the corridor and float into the corridor

with arrangements to be picked up by aircraft after September 15 and that the western caribou herd, which is the focus of caribou hunting along the Noatak, is also available to aircraft-borne hunters during the year outside the CUA in the same game management unit as the CUA.

Similarly, with respect to the Nenana CUA, the Board noted that "large areas near Fairbanks remain open to airboat use for moose hunting." Further, the Board stated that "an area of comparable habitat, size and accessibility remains available to airboat hunters in adjacent areas of GMU 20A and GMU 20C. This adjacent area has traditionally been less important for subsistence hunters and more frequently used by airboat hunters than has the NCUA."

**25.** *See Southeast Alaska Conservation Council,* 665 P.2d at 549.

In summary, the Board of Game is charged by the legislature to make the decisions it made with respect to these two CUAs. The record shows that the Board gave careful consideration to conflicting points of view in deciding as it did. While the Board's decisions are controversial and by no means the only reasonable decisions that it might have made, they are nonetheless the product of a process which was neither unreasonable nor arbitrary.

## IV. CONSTITUTIONAL CLAIMS

The Association's main argument is that the CUAs create and protect "local, monopolistic interests" by enabling local hunters to use their preferred methods of hunting transportation while putting non-local hunters who prefer other methods of hunting transportation at a disadvantage. The Association contends that this alleged local monopoly violates a number of provisions of the Alaska Constitution. These are article VIII, section 4—requiring state resources to be managed on the sustained yield principle subject to preferences among beneficial uses;[26] article I, section 1—the equal rights opportunities and protection clause;[27] article VIII, section 2—requiring the legislature to provide for the utilization, development and conservation of state resources "for the maximum benefit of its people";[28] article VIII, section 3—reserving to the people for common use state resources including wildlife;[29] article VIII, section 14—providing that access to the public waters of the state shall not be denied but that it may be regulated by the legislature;[30] and article VIII, section 17—providing that laws and regulations regarding the use of natural resources shall apply equally to all persons similarly situated.[31]

The Association's multi-faceted constitutional argument is answered by recent decisions of this court. In *Alaska Fish Spotters Association v. State, Department of Fish and Game*, a means and methods regulation banning the use of aircraft for the purpose of locating salmon was challenged under the same articles of the Alaska Constitution raised here.[32] We observed that "Fish Spotters' constitutional arguments carry little weight where, as in this case, the Board has exercised its authority by restricting means and methods of access in a manner which applies equally to all citizens."[33]

With respect to the common use argument in *Fish Spotters*, we stated that

> we·do not agree with Fish Spotters' fundamental premise that the common use clause obligates the state to guarantee access to a natural resource by a person's preferred means or method. We conclude that the regulation banning fish spotting in Bristol Bay was not constitutionally infirm.

**26.** Article VIII, section 4 of the Alaska Constitution provides:

> Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.

**27.** Article I, section 1 provides:

> This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

**28.** Article VIII, section 2 provides:

> The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.

**29.** Article VIII, section 3 provides:

> Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

**30.** Article VIII, section 14 provides:

> Free access to the navigable or public waters of the State, as defined by the legislature, shall not be denied any citizen of the United States or resident of the State, except that the legislature may by general law regulate and limit such access for other beneficial uses or public purposes.

**31.** Article VIII, section 17 provides:

> Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation.

**32.** 838 P.2d 798 (Alaska 1992).

**33.** *Id.* at 802.

Rather, it constituted a permissible limitation of the type traditionally imposed by the state on the means and methods which citizens may employ as they utilize fishery resources.[34]

Concerning the "no exclusive rights" clause of article VIII, section 15, we observed that the regulation in question did not grant exclusive rights or special privileges.

A ban on the use of a means of fishing does not equal a creation of an exclusive right or special privilege. It is true that only those who previously used aircraft to spot fish were directly affected by the disputed regulation. However, this will be the case whenever a regulation is adopted which bans the use of a certain tool for taking fish.[35]

Concerning the argument that the regulation violated the equal rights opportunities and protection clause of article I, section 1, and the uniform application clause of article VIII, section 17, we were also unpersuaded. We stated that because the regulation applied equally to all citizens it "did not implicate Alaska's 'equal protection' or 'uniform application' clauses."[36]

Another relevant case is *State v. Kenaitze Indian Tribe*.[37] There we discussed a contention that banning the subsistence priority in non-subsistence areas was in itself unconstitutional because residents in non-subsistence areas were thereby denied "convenient local subsistence access to fish and game resources."[38] We rejected this contention, stating:

Inconvenience is in no sense the equivalent of a bar to eligibility for participation in subsistence hunting and fishing and does not suffice to trigger an analysis under the equal access clauses. What we recently stated in *Tongass Sport Fishing Association v. State*, 866 P.2d 1314, 1318

(Alaska 1994), is also applicable to the current case:

We have held that the "common use" clause of article VIII, section 3, the "no exclusive right of fishery" clause of section 15, and the "uniform application" clause of section 17 are not implicated unless limits are placed on the admission to resource user groups.[39]

The basis for the classification contained in these CUAs is the type of equipment used, aircraft in the case of Noatak, and airboats in Nenana. But we have made it clear that distinctions based on the type of equipment used in the harvest of a resource are not prohibited by the Alaska Constitution. In *State v. Hebert*, we noted that "gear size limitations" like "time and area restrictions" were time honored management tools. We observed that "[w]e have not been presented with an argument which persuades us that such limitations may be at risk under either the federal or the Alaska constitution. Our constitution states that only 'persons,' not nets or boats, are 'entitled to equal rights.'"[40]

Based on these authorities, we conclude that the Association's argument that the CUAs create forbidden monopolistic privileges in local hunters must be rejected. The CUAs are open to any Alaskan who wants to use them. The equipment limitations which apply in the CUAs apply equally to all users. To be sure, the equipment limitations are an inconvenience to those who, to use the words of our *Fish Spotters'* decision, "had previously used the banned tool."[41] Still, those prior users have access to the resource equal to that of others and the inconvenience that they experience "is in no sense the equivalent of a bar to eligibility for participation" in big game hunting in the CUAs and thus "does not suffice to trigger an analysis under the equal access clauses."[42]

---

**34.** *Id.* at 801.

**35.** *Id.* at 803.

**36.** *Id.* at 804.

**37.** 894 P.2d 632 (Alaska 1995).

**38.** *Id.* at 640.

**39.** *Id.*

**40.** 803 P.2d 863, 865–66 (Alaska 1990).

**41.** *Fish Spotters*, 838 P.2d at 802.

**42.** *Kenaitze*, 894 P.2d at 640.

The Association makes two arguments that are independent of its argument that the constitutional equal access clauses are violated by the CUAs. It argues that article VIII, section 1 is violated. This clause provides that "it is the policy of the State to encourage the settlement of its lands and the development of its resources by making them available for maximum use consistent with the public interest." But the Association's argument on this point cites only *Wernberg v. State*, an eminent domain case dealing with the access rights of a riparian owner to adjacent navigable waters.[43] *Wernberg* casts no light on how article VIII, section 1 might be applied in this case, nor does the Association's conclusory argument · which devotes less than half a page to this point. Under these circumstances we consider the Association's argument on article VIII, section 1 to be waived.[44]

Very similar is the Association's argument concerning article VIII, section 14. This clause provides in part that "[f]ree access to the navigable or public waters of the State, as defined by the legislature, shall not be denied any citizen of the United States or resident of the State, except that the legislature may by general law regulate and limit such access for other beneficial uses or public purposes." Again, the Association cites only *Wernberg* and makes only a conclusory argument to the effect that this clause prohibits the CUAs. We consider this point also to be waived.

## V. CONCLUSION

For the reasons expressed, we AFFIRM the decision of the superior court upholding the validity of the CUAs.

---

**43.** 516 P.2d 1191 (Alaska 1973).

**44.** *See Martinson v. ARCO Alaska, Inc.,* 989 P.2d 733, 737 (Alaska 1999) ("Where a point is given only a cursory statement in the argument portion of the brief, the point will not be considered on appeal.").