*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALASKA FISH AND WILDLIFE CONSERVATION FUND, | ) ) ) | Supreme Court No. S-14516 |
| Appellant, | ) ) | Superior Court No. 4FA-11-01474 CI |
| v. | ) ) | O P I N I O N |
| STATE OF ALASKA and AHTNA TENE NENE', | ) ) ) | No. 6992 - March 27, 2015 |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Michael P. McConahy, Judge.

Appearances: Michael C. Kramer, Borgeson & Kramer, P.C., Fairbanks, for Appellant. Michael G. Mitchell, Sr. Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee State of Alaska. John M. Starkey, Hobbs Straus Dean & Walker, Anchorage, for Appellee Ahtna Tene Nene'.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.   INTRODUCTION

Regulations promulgated by the Alaska Board of Game establish two different systems of subsistence hunting for moose and caribou in Alaska's Copper Basin

region: (1) community hunts for groups following a hunting pattern similar to the one traditionally practiced by members of the Ahtna Tene Nene' community; and (2) individual hunts.[1] A private outdoors group, the Alaska Fish and Wildlife Conservation Fund, argues that this regulatory framework violates the equal access and equal protection clauses of the Alaska Constitution by establishing a preference for a certain user group. The Fund also argues that the regulations are not authorized by the governing statutes, that they conflict with other regulations, and that notice of important regulatory changes was not properly given to the public. But because we conclude that the Board's factual findings support a constitutionally valid distinction between patterns of subsistence use, and because the Board's regulations do not otherwise violate the law, we affirm the superior court's grant of summary judgment to the State, upholding the statute and the Board regulations against the Fund's legal challenge.

## II.    FACTS AND PROCEEDINGS

The Copper Basin Community Hunt Area, located in Southcentral Alaska, includes Game Management Units 11 and 13 and a portion of Unit 12.[2] After public hearings, the Board made extensive findings about the area in 2006, describing the customary and traditional subsistence use of moose and caribou.[3] The Board recognized the existence of a community-based pattern of subsistence hunting, originating with the

---

[1]    5 Alaska Administrative Code (AAC) 85.025 (2012); 5 AAC 85.045; 5 AAC 92.050; 5 AAC 92.072.

[2]    In a recent case involving these same parties, we discussed Ahtna's and the Board's respective histories with Unit 13 moose and caribou. *See Ahtna Tene Nene' v. State, Dep't of Fish & Game*, 288 P.3d 452, 455-57 (Alaska 2012).

[3]    The Board made these findings by considering the eight criteria described in 5 AAC 99.010(b). We upheld these eight criteria in *Alaska Fish & Wildlife Conservation Fund v. State, Dep't of Fish & Game, Bd. of Fisheries*, 289 P.3d 903 (Alaska 2012).

Ahtna Athabascan communities in the region and "later adopted by other Alaska residents." This community-based pattern, the Board found, was characterized by use of the entire caribou or moose, leaving only the antlers behind, and by events of "[w]idespread community-wide sharing" after the harvest.

In 2011the Board made supplemental findings about a second subsistence hunting pattern in the Copper Basin. This pattern, according to the Board, was an individual use pattern that occurs "among households and families" but unlike the community-based pattern is not "linked to extensive networks of cooperation and sharing." The individual use pattern occurs mostly during the fall, and it centers upon areas accessible from the road system. Individual subsistence users, like community subsistence users, tend to return to their "well-known and long-established camping/hunting sites," but they tend to travel much farther to get there. The individual use pattern does not tend to use organ meat; meat sharing is "less formal"; and the "peer pressure to share is far less pronounced."

Based on these two recognized patterns of subsistence hunting, the Board adopted regulations that bifurcated subsistence hunts[4] in Unit 13 into community harvests and individual hunts.[5] A community harvest permit is issued to members of a group of 25 or more who agree to engage in the hunting practices described in the Board's 2006 findings, including meat sharing and organ salvage.[6] The community moose hunt has a longer hunting season, has a larger geographic area, and is allocated

---

[4] Subsistence hunting statutes divide subsistence hunts into two tiers: Tier I hunts are those in which the resource is abundant enough to satisfy all subsistence uses; Tier II hunts are those in which it is not. AS 16.05.258(b)(1)-(4); *see State v. Morry*, 836 P.2d 358, 365-66 (Alaska 1992).

[5] 5 AAC 85.045; 5 AAC 92.050; 5 AAC 92.072.

[6] 5 AAC 92.072(c)(1).

up to 70 moose of any size.[7]  For caribou, the season, hunting area, and size of animal that may be hunted are the same for both the community harvest and individual permit holders, but the community hunt is allocated up to 300 caribou.[8]  (What this allocation means in practical terms is addressed later in this opinion.)

These regulations were challenged in the superior court by the nonprofit Alaska Fish and Wildlife Conservation Fund.  The Fund argued that the regulations violated the Administrative Procedure Act,[9] the subsistence hunting statutes, and article VIII of the Alaska Constitution.  The Fund asked the court to enjoin all community harvest hunts and to strike any statutes and regulations purporting to allow them.  The Fund also asked the court to require the revisor of statutes to strike or amend statutes that Alaska's courts have ruled unconstitutional in the past.  The local tribe, Ahtna Tene Nene', was granted leave to intervene as a defendant.

All parties agreed that the issues before the superior court could be decided on summary judgment.  The superior court ruled in favor of the State, holding that the challenged regulation had been properly noticed; that the regulatory scheme was within

---

[7]    *Id*.  Individual hunters may only harvest bull moose with spike-fork, 50-inch, or 4 brow tine antlers, while community harvesters may harvest any bulls but no more than 70 that could not have been harvested by individual hunters. 5 AAC 85.045. The community harvesters' any-bull allocation increased to 100 for the 2013 season. 5 AAC 85.045 (am. 7/1/13).

[8]    *See* 5 AAC 85.025.  In testimony before the Board, a representative from the Alaska Outdoor Council, the Fund's sister organization, expressed concern that community harvest permits would be issued per person while individual permits would be issued per household.  This potential inequity never occurred because by special regulation the Board limited hunters in Unit 13 to one caribou per household regardless of whether they held a community harvest permit or an individual permit. *See* 5 AAC 92.071(a); 5 AAC 92.072(c)(2)(A).

[9]    AS 44.62.010 – .950.

the Board's statutory power because the subsistence hunting statutes allow the Board to distinguish between different subsistence uses; and that the community harvest permit system did not violate the equal access provisions of the Alaska Constitution, article VIII, because participation in a community harvest was open to all Alaska residents. The Fund now appeals.

## III.    STANDARDS OF REVIEW

Summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, and we therefore review grants of summary judgment de novo.[10]  In a review of agency action we substitute our judgment for that of the agency when interpreting the Alaska Constitution and deciding issues of law.[11]  But "[w]hen the interpretation of a statute or other question of law implicates 'agency expertise as to complex matters or as to the formulation of fundamental policy,' we defer to the agency's interpretation so long as it has a 'reasonable basis' in the law."[12]  If "a case may be fairly decided on statutory grounds or on an alternative basis, we will not address the constitutional issues."[13]  When

---

[10]      *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 394 (Alaska 1990) (citing *Southeast Alaska Constr. Co. v. State, Dep't of Transp.*, 791 P.2d 339, 342 (Alaska 1990); *Grand v. Municipality of Anchorage*, 753 P.2d 141, 143 n.3 (Alaska 1988)).

[11]      *Alaska Fish & Wildlife Conservation Fund v. State, Dep't of Fish & Game, Bd. of Fisheries*, 289 P.3d 903, 907 (Alaska 2012) (citing *Koyukuk River Basin Moose Co-Mgmt. Team v. Bd. of Game*, 76 P.3d 383, 386 (Alaska 2003)).

[12]      *Wilber v. State, Commercial Fisheries Entry Comm'n*, 187 P.3d 460, 465 (Alaska 2008) (quoting *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982)).

[13]      *Id.* (citing *State, Dep't of Health & Soc. Servs. v. Valley Hosp. Ass'n*, 116 P.3d 580, 584 (Alaska 2005)).

a regulation is adopted in accordance with the Administrative Procedure Act and the legislature intended to give the agency discretion, our review is limited to ascertaining whether the regulation is consistent with its authorizing statutory provisions and whether it is reasonable and not arbitrary.[14]

## IV. DISCUSSION

### A. The Community Harvest Permit System Does Not Violate Article VIII Of The Alaska Constitution.

The Fund argues that the community harvest permit system is unconstitutional because it creates classifications that result in disparate treatment of Alaskans who are otherwise similarly situated. The superior court rejected this argument, reasoning that "[a]ny Alaskan is eligible to participate in either opportunity [i.e., the individual hunt or the community harvest] by complying with the regulatory requirements for each." We agree.

Sections 3, 15, and 17 of article VIII are the equal access clauses of the Alaska Constitution; they provide the constitutional framework within which the State regulates subsistence hunting and fishing. Section 3, the common use clause, provides that "[w]herever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use." Section 17, the uniform application clause, requires that "[l]aws and regulations governing the use or disposal of natural resources . . . apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation." Section 15 provides that there shall be "[n]o exclusive right or special privilege of fishery . . . in the natural waters of the State"; though the clause addresses only fishing, we apply its underlying principles when

---

[14] *Id.*

interpreting sections 3 and 17.[15] Together, these provisions "share at least one meaning: exclusive or special privileges to take fish and wildlife are prohibited."[16]

The equal access clauses are not implicated by a regulation that applies equally to all the State's citizens.[17] To be invalid under these clauses, a regulation must place "limits . . . on the admission to resource user groups."[18] "[W]e have consistently defined 'user groups' in terms of the nature of the resource (i.e., fish or wildlife) and the nature of the use (i.e., commercial, sport or subsistence)."[19] We have refused to define "user groups" based on a "particular means or method of access" to the resource,[20] and we have declined to recognize a constitutional right to "convenient" access.[21] Instead, we have repeatedly held that "[i]nconvenience is in no sense the equivalent of a bar to eligibility for participation in subsistence hunting and fishing and does not suffice to trigger an analysis under the equal access clauses."[22]

---

[15]     *McDowell v. State*, 785 P.2d 1, 9 (Alaska 1989).

[16]     *Id.* at 6.

[17]     *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 695 (Alaska 2001) (citing *Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game*, 838 P.2d 798, 804 (Alaska 1992)).

[18]     *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1318 (Alaska 1994) (internal citations omitted); *see also Interior Alaska Airboat Ass'n*, 18 P.3d at 695.

[19]     *Alaska Fish Spotters*, 838 P.2d at 803.

[20]     *Id.*

[21]     *State v. Kenaitze Indian Tribe*, 894 P.2d 632, 640 (Alaska 1995).

[22]     *Interior Alaska Airboat Ass'n*, 18 P.3d at 695 (quoting *Kenaitze Indian Tribe*, 894 P.2d at 640) (internal quotation marks omitted).

In *Alaska Fish Spotters Ass'n v. State*, we reviewed a challenge to a regulation that prohibited the aerial spotting of salmon in Bristol Bay.[23] Despite the Association's argument that the regulation "eliminated their 'historical' and 'long enjoyed' access to the fishery resource" as a unique user group, we concluded that the common use clause does not obligate the State to "guarantee access to a natural resource by a person's preferred means or method."[24] We further explained that although "each ban directly affected only a small number of people who had previously used the banned tool" and "precluded a preferred use of the fisheries resource," the bans applied equally to all persons in the State and did not preclude all uses of the resource.[25] We noted other ways the members of the Association could access the fishery resources besides the one they preferred: they "may access the resource in the same manner open to any other commercial fishers. They may participate in industries which support the fishery harvest. They may continue to use their planes to spot fish before an open commercial fishing period and to transport supplies and personnel for commercial fishing clients."[26] We concluded that the regulation was "a permissible limitation on the means and methods which any person may use to take salmon in Bristol Bay" and did not violate the Constitution's common use clause.[27]

---

[23] 838 P.2d at 799-800.

[24] *Id.* at 801.

[25] *Id.* at 802.

[26] *Id.*

[27] *Id.*

In this case, the relevant "user group" is subsistence hunters, which means all Alaskans, urban or rural.[28] All Alaskans are eligible to receive a community harvest permit; the only requirement for obtaining one is collaboration with other resource users. Like the members of the Fish Spotters Association, hunters who choose not to join a community group have another way to access moose and caribou: they can apply for an individual hunting permit. The requirement of joining a group may well be inconvenient for those who lack a ready community; but inconvenience is not a bar to eligibility for participation, and it is therefore insufficient to raise a constitutional claim under the equal access clauses.[29]

The Fund also argues that AS 16.05.330(c) and 5 AAC 92.072(d) are facially invalid under article VIII. The superior court found that while these provisions "could be applied in a manner offensive to article VIII," they could also be applied constitutionally.

"[A] party raising a constitutional challenge to a statute bears the burden of demonstrating the constitutional violation. A presumption of constitutionality applies, and doubts are resolved in favor of constitutionality."[30] The Fund's main complaint

_____

[28] *McDowell v. State*, 785 P.2d 1, 9 (Alaska 1989) (holding that admission to subsistence user groups could not be based on rural residency).

[29] The Fund argues that the regulations are unconstitutional under our decision in *Grunert v. State*, 109 P.3d 924 (Alaska 2005). In *Grunert* we invalidated a cooperative salmon fishery, but we did so under the Limited Entry Act, not article VIII. *Id.* at 932-46. As the State points out in its brief, there is "no analog to the Limited Entry Act or other statutory limitation on the Board's authority to regulate in the subsistence [hunting] context." We agree with the State that *Grunert* does not control our decision here.

[30] *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 388 (Alaska 2013) (alteration in original) (quoting *Harrod v. State, Dep't of Revenue*, 255 P.3d 991, 1000-

(continued...)

about AS 16.05.330(c) is that it "was passed as part of a comprehensive rural preference subsistence statute intended by the Governor and legislature to circumvent this Court's 1985 *Madison* decision."[31] But we will uphold a statute against a charge that it is facially unconstitutional even if it might sometimes create problems as applied, as long as the statute "has a plainly legitimate sweep."[32] And the Fund admits the statute can be read constitutionally: "At most, AS 16.05.330(c) gives the Boards discretion to consolidate and streamline the permitting process by issuing permits to areas, villages, communities, or groups." The Fund's facial challenge to the statute's constitutionality therefore fails.[33]

## B. The Community Harvest Regulations Are Authorized By Statute.

The Fund's challenge to the statutory authority for the community harvest system raises three questions: (1) whether the Board has the authority to adopt regulations that grant permits to communities; (2) whether such regulations can permissibly differentiate among various patterns of use of a subsistence resource; and

---

[30](...continued)
01 (Alaska 2011)).

[31]     The reference is to *Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168 (Alaska 1985), in which we held that subsistence uses could not be constitutionally limited to members of communities that had historically practiced subsistence hunting and fishing.

[32]     *State v. Planned Parenthood of Alaska*, 171 P.3d 577, 581 (Alaska 2007) (quoting *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 n.14 (Alaska 2004)) (internal quotation marks omitted).

[33]     The Fund also urges us to strike several unconstitutional statutes. But the Fund does not state which statutes are unconstitutional or what authority we have to rewrite statutes. We find this issue waived as inadequately briefed and do not consider it here. *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

(3) whether the regulations at issue here provide a "reasonable opportunity" for each subsistence use pattern.   We answer all three questions in the affirmative.

First, under AS 16.05.330(c) the Board "may adopt regulations providing for the issuance and expiration of subsistence permits for areas, villages, communities, groups, or individuals as needed for authorizing, regulating, and monitoring the subsistence harvest of fish and game."   This plain statutory language authorizes the issuance of community permits.

Second, AS 16.05.258(b)(2) not only grants the Board the authority to differentiate between subsistence uses, it requires the Board to adopt regulations that "provide a reasonable opportunity for subsistence uses" of those game populations that are "customarily and traditionally taken or used for subsistence."[34]   Here, after the Board identified the two customary and traditional subsistence use patterns of moose and caribou in the Copper Basin — the community use pattern and the individual use pattern — it was statutorily required to "provide a reasonable opportunity" for these subsistence uses of the relevant game populations.[35]   The Board's findings described two very different use patterns, with different hunting areas and seasons, different parts of the animal consumed, and different cultural and social traditions associated with the hunt.

---

[34]   AS 16.05.258(a), (b)(2)(A).

[35]   AS 16.05.258(b)(2)(A).

Because both patterns are "subsistence uses,"[36] the Board was required to provide "a reasonable opportunity" for each of them.[37]

The Board did so by its creation of the parallel community harvest and individual permit systems. The permit conditions for the community harvest closely track the Board's 2006 findings of customary and traditional use. The Board found that a community hunting pattern "was originally defined by the Ahtna Athabascan residents" but was "then adopted and modified by other local settlers in the early 20th century." The Board found that "[m]ost of the long-term subsistence patterns in this area are community-based," and that

> specialized hunters tend to provide for the community at large, sometimes or often taking more than necessary for their own family's use in their capacities as community providers, and to fulfill social and cultural obligations. Community subsistence activities are then divided among members and further introduced into traditional patterns of barter and exchange. Thus, some harvest and others process, distribute, receive and utilize the results of the harvest.

The community harvest permits reasonably provide for this use by allowing "a community or group of 25 or more to select, from their group members, individual

---

[36] AS 16.05.940(33) (Subsistence uses are the "noncommercial, customary and traditional uses of wild, renewable resources . . . for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption.").

[37] AS 16.05.258(b)(2)(A). We observe that the Fund's challenge is based on what it views as the Board's preferential treatment of one subsistence user group over another. It does not directly contend that holders of individual subsistence permits lacked a "reasonable opportunity," only that the opportunities in the community hunt were better.

harvesters who may possess particular expertise in hunting to harvest wildlife resources on behalf of the community or group."

Nor was the group size of 25 chosen arbitrarily. The Board was concerned that without a minimum size, "groups of two or three people [could] come in and create a very huge administrative burden." The Board set the group membership at 25 "to ensure that it really is a communal experience, and not just two hunting buddies together, that there really is some level of interaction and sharing and that there's a genuine group." This tracks the Board's 2006 findings about the community use pattern, which showed that the community or group potentially benefitting from a hunt was larger than a nuclear family — it involved "all family members, elders, [and] others in need."

The community use pattern also involves the "salvage and use [of] all parts of the harvested animal, in conformance with traditions prohibiting waste." Hunters retrieve "the entire carcass and all bones, hide, head, heart, liver, kidneys, stomach, and fat," leaving only the antlers behind. Permit conditions therefore require meat salvage, the taking of "[a]ll edible meat from the frontquarters, hindquarters, ribs, neck, and backbone, as well as the heart, liver, kidneys, and fat."

Also involved in the community use pattern is "[w]idespread community-wide sharing." Unlike use patterns in which hunters "are completely free to share, or not to share, as they see fit," the community pattern comes with a social obligation to share the game with others. This sharing "plays a key economic role in distributing essential food supplies throughout the community." Permit conditions therefore require community harvest permit holders to participate in "at least one communal sharing event."

The community harvest permit also authorizes a larger hunting area than that open to individual hunters. Community harvest permit holders are allowed to hunt

moose in all of Game Management Units 11 and 13 and part of Unit 12.[38] Individuals are limited to Unit 13.[39] This distinction is based on the Board's 2006 and 2011 findings about the different hunting areas frequented by community and individual hunters. The Board found that community hunters in the Copper Basin have "an intimate and exclusive relationship between the user and a very particular set of places generally in close proximity to the hunter's residence." Community hunters traditionally do not travel outside the Copper Basin to hunt, even when caribou and moose are hard to find. The Board found that individual hunters, in contrast, traditionally hunt in areas reached by road from Anchorage and Fairbanks, along the Denali and Glenn Highways, both of which are mostly within Unit 13; and they tend to go where the game is.[40]

We now consider whether the Board's regulations specific to the moose hunt and those specific to the caribou hunt satisfy the "reasonable and not arbitrary" standard of review.[41]

### 1. Moose hunting

Community harvest hunters are permitted to hunt one bull moose of any size for each person on the community group's list, while individual hunters are limited to bull moose with spike-fork antlers, 50-inch antlers, or antlers with four or more brow

---

[38] The 2011-12 hunt conditions opened only Unit 13 to caribou hunting by community harvest permit holders, "due to conservation concerns for adjacent caribou herds."

[39] 5 AAC 85.045.

[40] *See Unit 13: Nelchina-Upper Susitna*, ALASKA DEPARTMENT OF FISH & GAME (May 8, 2012), http://www.adfg.alaska.gov/static/hunting/maps/gmumaps/pdfs/ 13.pdf.

[41] *See Wilber v. State, Commercial Fisheries Entry Comm'n*, 187 P.3d 460, 465 (Alaska 2008).

tines on one side.[42]  Community harvest hunters also have a longer season:  August 10 to September 20, as opposed to September 1 to September 20 for individuals.[43]  The Fund argues that this provides the community harvest hunters with "an exclusive hunting opportunity" and is therefore impermissible.

We conclude, however, that the Board made findings sufficient to support some season and size differences between community and individual hunts.  Simply put, the community hunts are more likely to occur close to home, where it is harder to find moose; a longer season and fewer size restrictions help counter this difficulty.  During a 2011 Board of Game proceeding, a supporter of community hunts testified that the "50-inch antlered moose is . . . pretty scarce around where I hunt and it's usually pretty warm.  They're usually way up in the mountains.  Having a restriction for 50-inch antlers . . . makes [it] a hardship for . . . getting a moose. . . .  I took my daughter there last year, and . . . we saw a lot of bull moose, but . . . they aren't . . . 50-inch moose.  All small antlers."  At an earlier hearing in 2010, there was testimony that in early fall "all the moose are high during that time and the three brow tine and four brow tines are up high. . . . [Y]ou might find a spike fork near a road, but . . . people didn't really get any moose."  The community use pattern may require a longer hunting season because community harvest hunters traditionally "keep hunting as close to home as reasonably possible," "travel[ ] shorter distances to hunt," and "still prefer to walk in to hunting areas and maintain permanent camps."  If the community harvest permit holders hunt in the same areas each year and do not travel in search of better hunting opportunities, it is reasonable to conclude that they will need a longer season in order to find legal moose.  In addition,

---

[42]  5 AAC 85.045 (providing for "1 bull per harvest report by community harvest permit only . . .").

[43]  5 AAC 85.045.  Community and individual subsistence hunters have the same season for caribou.  5 AAC 85.025.

the Board found in 2006 that community harvest hunters hand "down the hunting and fishing knowledge, values and skills through family oriented experiences," which require "relatively long summer and fall camping trips." Although the Board heard evidence that the individual hunt would also benefit from a longer season,[44] we cannot say that the Board's adoption of a regulation setting a longer season and fewer size restrictions for the community hunt is arbitrary or unreasonable.[45]

## 2. Caribou hunting

The community harvest caribou hunt allows hunters to take one animal per group member, up to 300 caribou.[46] Individual hunters may also take one caribou each.[47] The Board, before adopting this regulation, discussed whether 300 caribou was a quota allocated to the community hunt, allowing the community hunters to take up to that many animals even if the individual hunt were closed; it also discussed the 300 caribou as an absolute cap on the number that community groups could harvest. In practice, the

---

[44] For example, the 2011 Board findings describing the individual subsistence hunting pattern note that "[a]ll hunters currently tend to focus their harvest efforts during the late summer and early fall, when caribou and moose are in their best physical condition and relatively accessible from the road system." The Board found that the individual hunting pattern also involved passing down "lore about how and where to hunt . . . from generation to generation." Furthermore, in the same session in which it adopted its 2011 findings, the Board rejected a proposal to allow non-community harvest members to engage in early moose hunting in Unit 13. The Board decided that even a short general hunt in August was not sustainable.

[45] *See Interior Alaska Airboat Ass'n. v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001) ("In determining whether a regulation is reasonable and not arbitrary courts are not to substitute their judgment for the judgment of the agency. Therefore review consists primarily of ensuring that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making.").

[46] 5 AAC 85.025(a)(8).

[47] *Id.*

Department has not treated the number of caribou assigned to the community harvest as a quota. In 2011, the Department closed the individual hunt by emergency order, explaining that the 2011-2012 harvest quota of 2,400 caribou had nearly been reached — individual hunters had taken 1,603 caribou, community hunters had taken 82, federal subsistence hunters had taken 361, and the holders of drawing permits had taken 311.[48] This closure left the community harvest and federal subsistence hunts open because "additional harvest [was] expected to be negligible."[49] In 2013, both the individual and community subsistence hunts were closed on October 10, despite the fact that only 112 caribou had been harvested under the community harvest permits.[50]

Reading the regulatory language in light of the Department's practical application of it, the grant of "up to 300 caribou" does not appear to be a quota that favors community hunters at the expense of individuals. Rather, it is an upper limit based on an estimate of the number of caribou that community hunters are expected to take each year, a number supported by the evidence before the Board. When the Board was discussing the community harvest regulations, Dr. James Fall, the statewide program manager for the State's Division of Subsistence, testified that it was difficult to determine how many people were interested in hunting caribou in Unit 13 and how many caribou were needed for subsistence, because the hunt there had been restricted for many years. Yet the Board did have evidence of the needs for community use — the Ahtna

---

[48] *See* ALASKA DEP'T OF FISH & GAME, EMERGENCY ORDER NO. 04-08-11 (Dec. 2, 2011), *available at* http://www.adfg.alaska.gov/static/applications/webintra/wcnews/2011/orders/04-08-11.pdf.

[49] *Id.*

[50] ALASKA DEP'T OF FISH & GAME, EMERGENCY ORDER NO. 04-07-13 (Oct. 9, 2013), *available at* http://www.adfg.alaska.gov/static/applications/webintra/wcnews/2013/orders/04-07-13.pdf

Subsistence Committee estimated this number at between 200 and 400 caribou.  The Board's decision to designate "up to 300 caribou" for the community harvest was based on this evidence, which contrasts with its lack of information about how many caribou were needed for individual subsistence hunters.[51]  Given the evidence before the Board, its estimate that the community harvest permit holders could take "up to 300 caribou" is not arbitrary or unreasonable.

C.   **The Community Harvest Regulations Do Not Conflict With Other Board Regulations.**

5 AAC 92.072(d) is a fish and game regulation of statewide application,[52] providing that the "total bag limit for a community harvest permit will be equal to the sum of the individual participants' bag limits."  The Fund argues that the Board violated this regulation when it eliminated the size restrictions on moose for holders of community harvest permits in Unit 13, effectively granting them a larger bag limit.  But the regulations do not conflict.  A "bag limit" is defined as "the maximum *number* of animals of any one game species a person may take."[53]  Board regulations provide that community harvest permit holders and individual permit holders are both entitled to harvest a single caribou and a single bull moose, although the individual permit holders are limited by antler size and shape and the community harvest permit holders are not.[54]

---

[51]   Discussing the number of available caribou, Board Chair Ted Spraker said that the Board needed more data and its members "really need to kind of step back from this and . . . let it go for a year" before they could get a "pretty good idea of what's going to happen."

[52]   *See* 5 AAC 92.001 ("[T]he regulations in this chapter apply statewide to subsistence hunting.").

[53]   5 AAC 92.990(a)(3) (emphasis added).

[54]   5 AAC 85.025; 5 AAC 85.045.

Alaska Statutes 16.05.255(f) and 16.05.258(e) both differentiate between "bag limits" and "size limitations" when discussing the areas in which the Board may regulate. Community harvest permits do not allow permit holders to take more bulls than the individual permit holders; the Board adoption of the community harvest permit system did not violate 5 AAC 92.072(d).

### D.    The Board's Amendment To 5 AAC 92.072(d) Was Properly Noticed.

The Board amended 5 AAC 92.072(d) in July 2009 to give itself the authority to assign different season lengths to community harvest permit holders and individual permit holders.[55] The Administrative Procedure Act requires the Board to give notice before amending a regulation.[56] The notice must include "an informative summary of the proposed subject of agency action."[57] When the ultimate agency action differs from that contemplated by the notice, the Administrative Procedure Act is satisfied "if the subject matter remains the same and the original notice assured reasonable notification to the public that the proposed agency action might affect its interests."[58]

The Fund argues that the March 2009 amendment is invalid because "[t]he Board did not provide any notice that it would be changing a regulation that required identical seasons and bag limits for community hunts to a regulation that allowed for preferential seasons and bag limits." But the superior court concluded that the notice

---

[55] *Compare* Alaska Administrative Code, Register 190, 3-511 to -512 (July 2009) (implementing current language of 5 AAC 92.072(d)), *with* Alaska Administrative Code, Register 182, 3-291 (July 2007) (prior language of 5 AAC 92.072(d)).

[56] AS 44.62.200(a).

[57] AS 44.62.200(a)(3).

[58] *Chevron U.S.A. Inc. v. LeResche*, 663 P.2d 923, 929 (Alaska 1983).

"did contain notice of proposed changes to [U]nit 13 seasons for caribou and moose, as well as proposed changes to community subsistence harvest areas and conditions," and was thus "sufficient to comply with AS 44.62.200." We agree.

According to the January 2009 notice — the one preceding the spring 2009 meeting — the Board was considering changes to 5 AAC 92, including changes to "HUNTING SEASONS AND BAG LIMITS" in Unit 13 for game including moose and caribou.[59] Also to be considered were changes to "LICENSES, HARVEST TICKETS, HARVEST REPORTS, TAGS, FEES, AND PERMITS" in units including Unit 13, and "including, but not limited to . . . community subsistence harvest areas and conditions."[60] The subject matter of the amended regulation was the relative length of the hunting seasons available to community harvest permit holders and individual hunters.[61] The January notice covered the same subject matter and was sufficient to inform the public that their interests might be affected. The notice therefore satisfied the requirements of the Administrative Procedure Act.

## V. CONCLUSION

We AFFIRM the superior court's grant of summary judgment to the State.

---

[59] There is no copy of the notice in the record on appeal. The superior court cited to the notice's on-line version. The Fund does not appear to question this reliance, and the State directs us to the same source. *See* ALASKA BD. OF GAME, NOTICE OF PROPOSED CHANGES IN REGULATIONS OF THE ALASKA BD. OF GAME SPRING 2009 MEETING (Jan. 23, 2009), *available at* http://aws.state.ak.us/OnlinePublicNotices/ Notices/View.aspx?id=144484.

[60] *Id.*

[61] *See* 5 AAC 92.072(d).